And there was a question before we began that the clerk brought in. I think it's probably easiest, let's do, you go first, hear the other side's response, and that's it. That's fine by us, of course, Your Honor. Just so you know ahead of time what we're planning. Good morning, Your Honors. My name is Mark Poe, and my firm had the pleasure of trying this case below, and now with our co-counsel from Goldstein and Russell, we represent the Trendsetter parties on appeal. Now, I intend to reserve about three minutes. I'll keep my eye on the clock. Of course, I want to make sure that I address any issues that Your Honors may have spotted, but for my part, I want to cover three topics. First, I want to talk about Swisher's failure to preserve any instructional error with respect to the proposed Instruction 29. And then I want to explain how even if Swisher had distinctly stated the grounds that its new counsel first asserted after trial, that it makes no difference to this case, both because the jury was fully instructed in Instruction 29 as given on the only evidentiary test that controls, even if this were originally litigated as and properly viewable now as a refusal to deal case. The second reason, then, is that the failure to give 29 as proposed was certainly harmless error to this jury verdict as this case was tried. Then finally, of course, if there's time, I want to talk about why it was error for the district court to grant summary judgment based exclusively on the evidence that came in at trial after immediately, previously holding that Swisher had waived the challenge to the sufficiency of that evidence. Don't we have to unravel the summary judgment ruling first? I don't think that we do. I think the proper order is to ask whether the new trial was properly granted. Because if the new trial, if Swisher did not preserve what it now says is its grounds for proposed Instruction 29, then no new trial would have been granted and the case would have come up on appeal from the judgment that entered in April 2016. And so I think the correct order is finding out whether the error was preserved. The other instructional issues as to whether they covered the topic, finding out whether that was harmless, and then only if we get beyond that, I think, do we reach the question about summary judgment. Focusing on the distinctness of the grounds and whether the instructional error was preserved, we can see that it was not. And it's easy to see because the rationale recited by the district court for holding that the alleged error was preserved is directly contrary to Supreme Court authority and to the language of Rule 51 itself. I want to quote the district court's rationale for how the error, the alleged error, was preserved. This is the ER 17. It is sufficient if the objecting party offered alternative instructions that were denied. And I want to compare that to what the Supreme Court says in Jones v. United States. Nor does a request for an instruction before the jury retires preserve an objection. Now, the Supreme Court, of course, it goes on to explain why that's so. It says, otherwise district judges would have to speculate on what sorts of objections might be implied through a request for an instruction. Such a rule would contradict the rule's mandate that a party state distinctly its grounds for objection. So what more must a party do other than simply file proposed jury instructions prior to trial to preserve the objection? Or is that sufficient? For each disagreed instruction, the party, well, both sides offering and opposing an instruction need to state the grounds for their- So if you did all of that before trial, you filed your proposed instruction and you said, and here's why I want to have it, then you did nothing else and everybody forgot because they moved on to a different view of the case. Is that enough to preserve it? I think that probably would be preserved. I mean, provided that the grounds for the instruction are commemorated in the record as the rule requires. And, you know, I want to focus the court on the direct language in Rule 51. There are two subparts pertinent here. 51C is titled How to Make an Objection to Jury Instructions. 51D is titled Assigning Error. And it says a party may assign as error a failure to give an instruction, of course, which is what we have here, if that party properly requested it and also properly objected. And so here, under the district court's formulation, Swisher only did one of those. It offered it without stating the grounds that were first raised to us as the trial counsel six weeks after the verdict came back. And that's another point that I want to focus on is the fairness. Now, I'm not a lawyer that typically resorts to fairness. It kind of seems intellectually lazy, but the prejudice here is intolerable, and that's because what we experienced was even worse than a party merely offering a jury instruction with no statement of grounds, because what we experienced was Swisher offering the instruction and stating two grounds, those two grounds having nothing to do with what came later. And so when we addressed those two grounds that were offered, we said, we are no longer protesting the termination of the relationship in 2014. That had been one paragraph in our complaint. We've dropped that as a form of anti-competitive conduct. And then we said, this case has nothing to do with the essential facilities doctrine, which was the other ground that they had specified. We thought we were done with it. Now, of course, if new counsel perhaps had been present at trial, and they had said during that instruction settlement conference when we met with the court the day before the instructions were given, you know what, actually we have a third ground. The third ground why we must give this introductory instruction is that this entire case is a refusal to deal. This is just like Aspen, just like Trinco. Every single thing that you're alleging from beginning to end is refusal to deal. You know, I mean, I assume we might have protested that, but then when you look at the context, rule or instruction, the proposed instruction 30, what came in as instruction 29, that was already coming in anyways. And that sets forth the controlling test of legitimate business purpose. And so the only difference between what was coming in anyways and what would have been coming in had they distinctly stated the grounds is this proposed instruction 29. The only difference between it, substantive difference between it and 29 as given, is the phrase that Swisher repeats in its briefing, ordinarily a company may deal or refuse to deal with whomever it pleases. Now, that language does not set forth any charge to the jury about what it's supposed to do. It is, I mean, the best formulation of it is that it's a theory of the case instruction. And this court's precedent, I know Judge Fletcher, you sat on Brewer v. City of Napa, which holds that it was up on instructional error, and it holds it is not error to reject a theory of the case instruction if the other instructions in their entirety cover the defense theory. And then that brings me right to the second point that I said I wanted to raise, which has to do with the fact that instruction 29 as given fully covers the evidentiary test. Even if this were, and again, we do not concede, we don't think this is an agreement to deal in a course of dealing, not a refusal to deal in the first place. But I am happy to play on Swisher's turf here because the evidentiary test was given. And how do we know that this is the only evidentiary test? That's because the Supreme Court says so. In the Eastman-Kodak case, this is 1992, six years after Aspen, a refusal to deal case, the Supreme Court writes, liability turns then, liability turns, on whether valid business reasons can explain the monopolist's actions. That is exactly what the jury was asked to determine in instruction 29 as given. And if we assume, I mean, of course we must, that the jury followed the instructions that it was given, it properly concluded that of the various, and I will remind you, because the case wasn't litigated by Swisher as a refusal to deal case, they didn't postulate their excuses as legitimate business reasons, but they did set forth a number of excuses. This jury necessarily concluded that none of those proffered excuses was legitimate. It decided that Swisher had no legitimate reason and that it engaged in this conduct solely for the purpose of creating or maintaining a monopoly. The other thing I should say about that actually is, of course I'm happy to discuss the facts around these, what are now articulated as legitimate business reasons, but this is another issue where Swisher did not make a motion at the 50A stage to challenge the sufficiency of the evidence that we had presented in our case as to the absence of any legitimate business reasons. It also, it leads me to another point, which is that during closing, again, you know, Swisher made no reference to any jury instructions. It was, in fact, myself. When I stood up first in closing, I was the one who drew the jury's focus to legitimate business reasons. And I said, they haven't offered any legitimate business reasons. Look, they offered this, but here's the evidence showing that's pretextual. They offered this, but that's not true. We heard from, and walked all the way through them. I should say that that, you know, that leads into, and again, now we're on like a tertiary issue. If this had been a refusal to deal case and litigated as such, if the alleged error had been preserved, now we need to talk about whether or not that was prejudicial error, whether or not it's more likely than not that this jury would have come back with a different verdict. If only it had heard the phrase, ordinarily a monopolist may refuse to deal. We cited to the district court four reasons why, from the record, that indicate that the omission of that phrase was harmless. And, well, before I get into those reasons, I want to say that you might have noticed there was some disagreement in the briefing as to whether the standard of error, or the standard of review in district court's harmless error decision is de novo or abuse of discretion. Of course, we cited United States v. Rodriguez, indicating that it's de novo. The Supreme Court in Arizona v. Fulminante also says de novo. Swisher argued, I think without citation, argued that it should be abuse of discretion. But here, it doesn't matter because in concluding that this was harmful error, the district court never set forth any rationale for believing that it was so. The district court only said it is skeptical that the court, the court is skeptical that the jury would have came back with the same verdict, without setting forth any grounds. And I have in mind, I'm sure Your Honor is familiar with, like, fee petitions and stuff like that, where a district court simply announces its decision without setting forth any grounds. Then the court reviews de novo instead of an abuse of discretion. But I've spent too much time on that. Well, as I understand it, the last ruling of the trial court was to grant summary judgment on the Section 2 claims to your opponent, correct? Right. All right, so if we affirmed on that basis, then all of your argument that you've just presented would be irrelevant, as I understand it, correct? No, I have to say, and I come back to my answer to Judge Paez, is that that is all predicated, and this is, in fact, acknowledged in Swisher's red brief. You never arrive at the court reconsidering summary judgment unless you agree that Swisher properly preserved the error and that a new trial was properly granted. And maybe you can explain that to me just a little bit. Well, I mean, we can think about it a couple of ways. We can think about it chronologically in that, you know, first the order comes down that the error was preserved and that it was harmful, and therefore we should have a new trial. And then as it unfolded, we were in trial prep mode for four to five months, going with the scheduling order and whatnot, and then Swisher brought, based on Aerotech, a motion to reconsider the prior summary judgment ruling. So if the new trial had not been granted in, this would have been June of 2016, then the judgment that had entered in April 2016 would have been up on appeal, and it would have been, well, of course, the district court no longer would have had any jurisdiction. Well, the district court was able to get to the summary judgment once he granted a new trial. Correct. Because that opened the record. Correct, correct. But when we think about whether it really opened the record, and, you know, maybe I'll finish with this. The procedural irregularity of granting summary judgment after a trial is concluded, but where the body of facts at issue in that summary judgment is exclusively, and if we look at what Judge Selma cited as the relevant facts there, he's citing exclusively evidence that came in. From the record, from the trial. From the trial. Right, that's right. And so it's a little funny because the only difference, he's first held that he cannot grant a Rule 50 order because Swisher waived all those challenges, and so it is a little, well, I think it's quite odd to say that, well, I can't grant a Rule 50 order, and so I'm going to change the title of this to, and I don't mean to be pejorative to the judge, of course, but so now I'm going to call this a Rule 56 motion, a Rule 56 order. And, of course, that, you know, part of the purpose of Rule 50 A and B is to preserve judicial economy and to narrow the scope of things that come up on appeal. If a district court can find that any challenge to the evidence at trial was waived because it hadn't been raised, and then after the trial is over say, but nonetheless, I'm going to entertain a summary judgment motion based on that evidence that came out of the trial. Well, procedurally what he did was a little bit odd on the summary, I thought it was a little peculiar the way he handled the summary judgment, but if he had just limited his analysis to the summary judgment record as it existed and overlaid the recent Aerotech decision, then, you know, he might have been okay. But I personally think that there's some difficulties with the way in which he handled the summary judgment proceeding, and I only speak for myself. But let me ask you another question. Yes, please. Just shifting gears, I want to ask you about the monopoly. There was a grant of a judgment on the monopolization claim. Yes. Relying on the mismatch kind of theory that Judge Selma identified between the market that was in play and the evidence regarding damages, which were. Yes. Your position on the market was it was regional damages yet showed national, and Judge Selma said, well, there's a complete mismatch there. So I have two responses to that. The easiest is that because Swisher was found liable by the jury both for actual monopoly and attempted monopoly, I don't know if I'm fine with it, but if judgment is entered on the monopoly claim, that makes no difference to the verdict or the amount of the judgment, because attempted monopoly would still apply. But I have to say that, you know, Judge Selma was unfortunately incorrect about that. It's true that our expert witness was advocating regional markets, but their expert witness was advocating a national market. And, of course, the jury was instructed, as all juries are, that when they hear evidence from a witness, they can believe or disbelieve different parts. Some all or none. And so it's an easy thought experiment, you know, Xiong v. American Gem Seafood says an exegesis, to find that the jury found a national market, but it awarded monopoly liability based on the direct evidence of monopoly power. And that might take a second to explain. I'll do it in 30 seconds. Monopoly power can be proven either by indirect evidence, which contains a number of factors, market share being one of them, or by what's called direct evidence, that is the monopolist having the ability to maintain super competitive pricing. Swisher never challenged at the 50A stage the super competitive pricing, the sufficiency of the direct evidence, or the indirect evidence, quite honestly. So it's easy for the jury to find direct evidence of monopoly liability and a national market and therefore come back on the actual monopoly claim as well. I should reserve two minutes. Thank you. May it please the Court. I'm Dan Swanson on behalf of Swisher in this case. I'm sorry to jump right in, but do you agree that we need to look first at whether or not the trial court erred in granting the new trial as the first step here because then otherwise you don't get to the summary judgment issue? If you looked at that first, I'd be perfectly confident. We've made the arguments as to why there was no procedural error, but I think that there is no need to look at that first. I think this Court should go straight to substance in this case. This case was dressed up as an antitrust case. It's not. And there are several ways to get to that conclusion that raise no procedural hurdles whatsoever. One way is to take account of the fact that we were proceeding to a new trial. Judge Selna had thrown out the monopolization claim because Mr. Poe talks about a mismatch, but that the jury could have found a national market on the monopolization claim. But the jury couldn't have found monopoly power in a national market. There was an inadequate market share. There was no evidence from which the jury could infer there was a monopoly. That theory was never presented by TSI. So the monopolization claim was already out. The judge, Judge Selna, had said we're going to have a new trial on the attempt claim. We were moving forward toward that under this Court's authority in Hoffman v. Tonnemacher, a case we cited in the papers. We'd already clarified that we would have a chance to bring another summary judgment motion before that second trial. In light of Aerotech, it made no sense to bring a new summary judgment motion when we had brought one before that was based on the district court decision in Aerotech. What was so significant about Aerotech? I mean, I read Aerotech and I read the other cases, and I just failed to see what was the major change in law that the Ninth Circuit recognized in Aerotech that allowed the district court judge to say, ah, this is just all a legal issue. Aerotech provides the answer. Summary judgment should have been granted here. I think, Your Honor, that you don't have to look to us because they, for reconsideration as well, they said the exact same thing we did. I take my own view of what's in play here, so I want you to help me. Okay. Well, I do want to help you. I think Aerotech was a decision in an area of law that over the years has caused some judicial, I won't say consternation, but puzzlement. You've got the Supreme Court itself issuing two cases on this, essentially limiting Aspen to its facts. Didn't overturn it. No, no, I would say limiting it to its facts. I think it's the only case that's ever gone to trial that's ever been held to have established a duty to deal, ever. Now, you've got this issue marching through all of the circuit courts of appeal. There's a case right now in the Seventh Circuit. The Department of Justice has just submitted an amicus brief this week, and it endorses, not specifically because they're talking about Seventh Circuit cases, but the test that the Department of Justice Antitrust Division says applies here is the one that Aerotech articulated. It's the one that Judge, now Justice Gorsuch, articulated writing for a panel in the Tenth Circuit Novelle, which is a case that Aerotech found very influential. So, no, I don't think that we were arguing it was an ethical change in law. I think it was a clarifying decision. It made clear what the Ninth Circuit felt about this subject. I think Judge Selna was very diligent and conscientious in wanting to take account of it. No one is arguing that reconsideration was inappropriate. We were in an interlocutory mode. Under Rule 54B, Judge Selna was perfectly entitled to revise a prior order, and the fact that the trial record was consulted was something that was injected by the plaintiff. We didn't object to it. Judge Selna let them bring the trial record into it. We would have done it on a second new summary judgment motion in any event. There was nothing inefficient about it. There was nothing unfair about it. So this is a duty-to-deal case. They did need to establish a duty-to-deal. But here's my problem. It does, the plaintiffs, it seemed to me, have the better of the argument on the question as to whether or not this case, when it was originally tried, was a refusal-to-deal case. It was not. And you got the equivalent of the instruction that you wanted. In fact, I think it was a better instruction than you deserved on refusal-to-deal. I don't get it. What's the problem? I think there are a bunch of issues. This case was always predicated on a refusal to cooperate, a refusal to fulfill orders. That's what Trinko is. Trinko is a refusal-to-fulfill-orders case. If that's not a refusal-to-deal case, I don't know what is. It's on all fours with this case. And so what they said, the way the jury instructions were, and by the way, just to go back to the summary judgment, we based summary judgment on AERODEC, the case that was affirmed by this court under the rubric of refusal-to-deal, the case law that articulates that. With respect to the standard for dealing with refusal-to-deal cases, refusals to cooperate, originally the plaintiffs had a claim, and it was in the first set of jury instructions. The first set of jury instructions they submitted said that one of the things we want the jury to determine with respect to anti-competitive conduct here is Swisher's refusal to renew the final PLA, the second PLA. But that didn't go to the jury. Well, because that was in their first jury instruction, you're right, they withdrew that. Then we said, then Swisher said, here's what needs to be submitted in a case that involves these issues. And it's super clear because one of their claims has the words refusal to deal in it. But that was the claim that was withdrawn. Wasn't that like a post-2014? And they came back, and then they said, no, no, no.  And so we said, yes, we understand that they're withdrawing that claim. They should. But the case still is suffused with refusal-to-deal issues. And we submitted. Where is that? That is in the record. Of course, I will have to find the citation. Well, is this where you talked about there was another theory that was raised in the original objection you had, not just on the 2014 claim, but the specifics of it? I'm sorry, Your Honor. No, that's all right. What I'm trying to say is that we knew they had withdrawn that. And we continued to assert that the instruction, both instructions were proper. It's important to see here that there are two instructions because there are two different issues. And maybe this goes to Judge Fletcher's concern. The business justification defense is a defense in all Section 2 cases. That's not unique to refusal-to-deal cases. And, yes, we asked for that. Any Section 2 defendant would ask for that. That's about motivation. You have to show that your conduct is motivated at least in part by legitimate business considerations. That's subjective. And the jury concluded that it was not, even in part. That's the inference from the way they ruled, yes. Well, no, I think it's more than an inference. It's an obvious conclusion. Otherwise, they wouldn't have ruled for you. I'm not disagreeing, Your Honor. What I'm saying is that's a subjective test. The Aerotech test, the test that was reflected in jury instruction number 29, is an objective test. It requires proof of sacrifice of profit, and it requires proof that that sacrifice is rational, makes sense only if it's part of a scheme in the long run to achieve higher profits through exclusion of competition. That's an objective test. They're two different things, and that instruction was not given. The jury was not. I have another problem, and that is as I read the blue brief and then as I read the yellow brief, excuse me, the red brief, and then I went back into the record, and we got long excerpts and so on, I have to say that I found that the description of the record in the blue brief was accurate and the description of the record in the red brief was incomplete and misleading every time I checked. Well, that disturbs me, Your Honor. Yes, it should. For example, I'll just give you one example, and this is misleading rather than correct, with respect to the wet wrappers. You say, well, there's evidence in the record that it was not directed at TSI, and you let it go at that. Well, of course, that's right, but that wasn't the charge. The charge was when they tried to send them back, you said they couldn't send theirs back, but you took back the others. I mean, why are you writing it that way? You expect that I'm not going to go back and check the record? Your Honor, I would urge you to look at it again because it's certainly not our intent. The issue, the legal issue there is whether or not, how do we analyze that under the antitrust laws? Is this some type of affirmative conduct that doesn't fall under Trinco or Linkline or the duty-to-deal cases? And Judge Justice Gorsuch in Novell answered that issue, that if it's within the rubric of refusal to cooperate, then it comes under the duty-to-deal cases. It's subject to those tests. In that case, the claim in the wet wrapper incident, the claim was not that we had set out intentionally to injure their reputation by injuring our own reputation by sending out a product that had defects in it. Their argument is we refused to cooperate by taking the product back from them, from their distributors. Our point was that's a refusal to cooperate. It's subject to the same test, and we should have been able to have the jury instructed, number one, that we had no general duty to cooperate, and that was in the instruction that wasn't given. That was in Aspen. The only case that's ever – Contractually obligated to take it back if it was defective. I think the answer to that is no. We were – TSI, under the contract, was obligated to inspect the product when it was delivered to them, and if they had an issue with it, based on that inspection, they were to inform us under the appropriate procedure. That didn't happen. But, I mean, I think that's a side issue. And we certainly – I feel quite chastised that Your Honor thinks that we're trying to misrepresent something we're not. We're actually trying to get to the merits. I'll just say it this way. When I read the factual narrative in the blue brief, and then when I read the factual narrative in the red brief, these were very, very different narratives. And when I went back to the record to check, every time I checked, the blue brief was right. Well, the only thing I can say – I guess two things I would say, Your Honor. One is I don't think there was any misrepresentation of the factual record. I think one aspect of this that we would certainly like to convey is that there was a big dispute as to whether or not there was a breach of contract or the implied covenant here, and that's why an invalid antitrust claim, which allowed a whole bunch of arguments to be made from the antitrust side about monopoly, monopolistic intent, evidence that was introduced, evidence of our profitability, all of those types of things prejudiced the jury and would not have gone in in a pure contract or an implied covenant case. And there was a dispute here. Most of the damages here were driven by this period of time between the two written contracts, and that's when big orders came in. That was a period of time when the argument was that we were creating a contract by our conduct, and that was a fiercely contested issue. But the case ended up being tried rhetorically as an antitrust case. There was evidence brought in about how big we are, monopolist, evidence of our profitability, which under Florida law, which is what governs here for the state law claim, wouldn't have come in on a contract claim, on a covenant claim. And so, again, I would like, I mean, I think for us, an invalid antitrust claim is really the heart of the argument we're trying to convey here, and it prejudiced us on the contract side. But on the substance, this was not an antitrust case. And one issue that I think is quite important, presents no procedural issues or roadblocks, is injury to competition. If there was a duty to deal case or a duty to deal here, you would think there would be injury to competition as a result of the conduct. And TSI's theory that Judge Selna accepted was that a failure to fulfill orders translated into a restriction of output on the marketplace. This court has said repeatedly, obviously, channeling the Supreme Court, that an antitrust plaintiff must prove that there is injury to the market as a whole, to competition in general, not just to their own business. There was some evidence that wasn't there before the jury, and the jury got to make that call. I think the issue is the jury did get to make that call, and we made a motion for judgment as a matter of law. On that particular issue, Judge Selna must agree with you. On that exact specific issue. And Judge Selna denied it, and we are appealing that. And the standard is de novo. And it's an issue as to which we have a Supreme Court decision in the last several months, the American Express case. In that case, we got to submit our one-page 28-J letter. But that case is very important to understanding why there was no injury to competition here. Judge Selna didn't have the benefit of that case, and we think that the way that issue was dealt with was mistaken. A restriction, a failure to fill orders does not translate, especially on the part of a small player in the market, does not translate to restricted market output altogether. What Judge Selna held, and he accepted this at the urging of TSI, was that the two should be equated. A failure to fulfill orders should be equated with an impact on the market as a whole. It's a very big market. We're talking about billions of cigarillos sold, and certainly many billions over the relevant time period. Judge Selna acknowledged that there was enormous growth in output in that market. He acknowledged there were new entrants, but he hypothesized that if Swisher had fulfilled with TSI, a single market player, output in the market as a whole could have been higher. And he shifted the burden to us to disprove that, to prove there was no impact on the market as a whole, and then he found that we hadn't met that burden. That was wrong. That was wrong at several different levels, and it's wrong in conflict with Supreme Court precedent. Brook Group versus Brandon Williamson is a case that I'll mention in a moment that Amex built on, but Brook Group was a case where the Supreme Court confronted the issue of what a plaintiff's burden of proof was in proving competitive injury in a situation where you have a growing market and you need to prove a restriction of output. And the Supreme Court basically said that a claim of restricted output in a growing market can't be based on speculation about even more growth if the defendant hadn't engaged in his conduct. The Supreme Court said that the plaintiff must come forward with concrete evidence. The Supreme Court didn't say the burden shifts. The Supreme Court said that proving restricted output in a growing market was, quote, a counterfactual proposition, unquote, that is, quote, difficult to prove in the best of circumstances. That's a burden that the plaintiff bears, not the defendant. It can't be shifted to the defendant. Amex was a case also with a growing market, 30 percent over five years in Amex. And in that case, the plaintiff, the government, came forward and said, we've met our burden of proving injury to competition because the defendant, American Express, raised price. There's some evidence that American Express raised price. And the Supreme Court said, no, you haven't met your burden of proof. You've got no evidence that its higher price was higher than anyone else's price. We could affirm that the district court's ruling on monopolization. Yes, you could. Without getting into injury to competition. Correct. Correct? Correct. Because he said he concluded there was a mismatch. He was right. And we just heard from your opposing counsel here a few minutes ago. Absolutely, yes. There was no proof of causal injury and damages because they had two markets where they said we could have a monopoly, never claimed we could have a monopoly in the national market. They calculated injury and damages solely on a national basis. Those two markets that they alleged we had a monopoly in covered 13 states. There were 37 states in which there was no rational basis for finding a monopolization. They had a national market number. Same was true on attempt. We do have a cross-appeal issue on that. There were five markets out of 12 in which they claimed that there was attempted monopolization. And so between the two and the five, that was seven out of 12 markets. They didn't claim that there was an attempt or monopolization in the entire country. And what Judge Selna said was, well, maybe they tried to prove on a regional basis that you were a monopolist and they didn't succeed because they couldn't prove causal injury. But we can assume they found a national market and that corresponded with the national damage calculation of the attempt claim. The problem was we had asked for a question in the jury verdict form, asking the jury which relevant market they'd found. If we had gotten that, it was denied. If we'd gotten that, we'd know the answer to this question. Judge Selna's saving of the attempt claim was based on the assumption that the jury would have had a national market for attempt purposes and a regional market for actual monopolization purposes. The case was never presented that way. There are inconsistent market determinations. They didn't argue that way. We didn't argue for inconsistent market determinations. And that would have been clarified if our request for the jury to tell us what market it found was granted. But I go back to Amex in my last few seconds. This is not a case of restricted output injury to competition. Swisher reduced its prices in every year. Prices were 20% lower by the end of this time period, 2011 to 2014. Output skyrocketed. There were new entrants. There was low-cost competition. There were major competitors. All of them could meet unmet demand if there was any unmet demand as a result of a small reduction relative to the size of the market in orders that were fulfilled. And so we would urge this court to look at the merits of the antitrust issues. This was not an antitrust case. And, again, I apologize. Judge Fletcher, I'm grievously distressed that you feel the way you do about the record, and I do urge you and the panel to look at it again. We did not intend to misrepresent anything. And I think it's a very complex case. Maybe misleading is the better word. Well, we certainly didn't intend to mislead either. And it's a very complex case, and there are a great deal of different ways of looking at it. And we had a limited number of pages to put forward the case. All right. Thank you, Robert. Thank you. Your Honors, I certainly don't want to be perceived as piling on at this point. But Swisher's counsel just said that we had not advocated a national market for the attempted monopoly claim. That's not true. I would direct the court to where I advocated for that in closing. This is in the RER at page 18, where our expert advocated for it in his testimony is at RER 36. If there's any concern about the mismatch, I would refer you to the portion of our yellow brief that addresses that. Second, on the harm to competition, Swisher points out that Brook Group says that it can be difficult to prove harm to competition in an expanding market. That's a far different proposition than where a jury is properly instructed on the issue, here's evidence for eight days, and if it finds harm to competition, that jury's verdict must be reversed. It also doesn't address the other harms to competition that the jury was charged with having to do with price and quality. Here, a low-price, high-quality alternative to Swisher was removed from the market entirely, and consumers were left with paying two for 99 instead of three for 99. I want to close by saying I think I don't quarrel with the notion that if this case had been presented by the defense as a refusal-to-deal case from the very beginning, that that would have presented an interesting issue. I think we probably still would have disputed that, but the fact of the matter is that Swisher's trial counsel did have a theory of the case coming in. Its theory of the case coming in, we can see from the opening and the closing, was that we didn't do any of this stuff. We're pure as snow. Trendsetter is at fault for its own sake. If it had come in and said, yeah, we did all this stuff, but we can't be liable under the antitrust laws, then what is it doing? It's admitting at least $10 million in liability on the contract claims. Juries don't really follow. I'm sorry, courts entertain arguments in the alternative, but when you're defense before a jury trial, you cannot get up and tell the jury, yeah, even if we did all that stuff, we can't be liable under the antitrust laws. They'll say, he just admitted doing it, and then they'll find you liable under the antitrust laws in the first place. Thank you, Your Honors. Thank you. Thank both sides. Trendsetter USA International versus Swisher International submitted for decision, and that completes our argument for this morning, and we're now in adjournment. All rise.
judges: W. Fletcher, Paez, Gleason